UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

DARREN AUSTIN MILLS,                          )
                                              )
                         Petitioner,          )        Case No. 1:03-cv-626
                                              )
v.                                            )        Honorable Wendell A. Miles
                                              )
JOHN CASON,                                   )
                                              )        **REPORT AND RECOMMENDATION**
                         Respondent.          )
_____)

      This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. On October 15, 1999, Petitioner was convicted in the Calhoun County Circuit Court of four counts of assault with intent to do great bodily harm less than murder, MICH. COMP. LAWS § 750.84; four counts of assault with intent to rob while armed, MICH. COMP. LAWS § 750.89; and one count of conspiracy to commit armed robbery, MICH. COMP. LAWS § 750.529. The trial court sentenced Petitioner to imprisonment of six to ten years for each of the assault with intent to commit great bodily harm convictions, life imprisonment for each of the assault with intent to rob convictions, and imprisonment of thirty-five to seventy years for the armed robbery conviction. All of the sentences are to be served concurrently. In his *pro se* petition, Petitioner raises nine grounds for relief, as follows:

    I.      Petitioner was deprived of his Am VI right to an impartial jury when the trial court denied his motion for a change of venue.

    II.     Petitioner was deprived of his Ams V and XIV rights of Due Process when the trial court denied Petitioner's motion to exclude in court identifications.

III.    Petitioner was deprived of his Ams V and XIV rights of Due Process when the trial court denied his motion for certain discovery.

IV.    Petitioner was deprived of his Ams V and XIV rights of Due Process when irrelevant and unfair evidence was introduced.

V.    Petitioner was deprived of his Ams V and XIV rights of Due Process when a photograph show up was conducted without the presence of counsel.

VI.    Petitioner was deprived of his Ams V and XIV rights of Due Process when hearsay statements (conspiracy exception) were introduced.

VII.    Petitioner was deprived of his Ams V and XIV rights of Due Process when the trial court allowed evidence of flight.

VIII.    It was a deprivation of Due Process under Ams V and XIV of the US Constitution to fail to instruct the jury that their verdict must be unanimous with regard to *each offense*.

IX.    Petitioner was deprived of his Am VI right of Confrontation and Ams V and XIV rights of Due Process when statements of a non-testifying co-perpetrator were allowed into evidence.

Respondent has filed an amended answer to the petition (docket #31) stating that the petition should be dismissed. Petitioner filed a "traverse" to Respondent's answer (docket #33). Upon review and applying the AEDPA standards, I find that Petitioner's claims either are without merit or are procedurally defaulted. Accordingly, I recommend that the petition be denied.

<u>**Procedural History**</u>

**A.  Trial Court Proceedings**

Petitioner and two co-defendants, Jamie McClam and Chavel Hall, were accused of robbing, raping and brutally assaulting four women at the King's Garden Health Spa (King's Garden) in Battle Creek during the early morning hours of January 27, 1999. Defendants were further accused of setting the building on fire before fleeing the scene. Two of the victims died as

- 2 -

a result of the injuries sustained from the assaults and ensuing fire.  Petitioner was charged with two counts of second-degree murder, two counts of first-degree felony murder, two counts of assault with intent to commit murder, four counts of assault with intent to commit armed robbery and conspiracy to commit robbery.  Each of the three co-defendants was tried separately.  Petitioner was tried last in October 1999.[1]

Angela Chase was nineteen-years-old at the time of trial.  (Tr II, 147.)  Chase testified that she had known Petitioner, McClam and Hall for several months prior to the events at issue in this case.  McClam was Chase's boyfriend.  (Tr II, 81.)  The four of them got together at about 8:00 p.m. on the evening of January 26, 1999.  (Tr II, 43-44, 86.)  They drove around in Chase's Ford Explorer, making various stops to drink and smoke marijuana with friends.  (Tr II, 90-99.)  While they were driving in the vicinity of King's Garden at about 12:30 a.m., McClam asked whether they wanted to "hit a lick."  (Tr II, 50-51, 99.)  Chase took that to mean that McClam wanted to get money or have sex.  (Tr II, 50, 100.)  McClam, who was driving at the time, parked behind the Postumville Pub, which was next to King's Garden.  (Tr II, 52, 104.)  McClam and Petitioner got out of the car and went in King's Garden.  (Tr II, 53.)  McClam was wearing a long black leather coat, jeans, a sweater and boots; and Petitioner was wearing a Green Bay Packers coat and green Nike tennis shoes.  (Tr II, 52-53, 76, 105-106.)  Chase testified that McClam always carried a nine-millimeter Ruger.  (Tr II, 52, 54.)  As he had been instructed, Hall went into King's Garden a few

---

[1]The trial transcripts will be identified as follows:
Trial Transcript Volume 1, October 6, 1999 - "Tr I"
Trial Transcript Volume 2, October 7, 1999 - "Tr II"
Trial Transcript Volume 3, October 2, 1999 - "Tr III"
Trial Transcript Volume 4, October 13, 1999 - "Tr IV"
Trial Transcript Volume 5, October 14, 1999 - "Tr V"
Trial Transcript Volume 6, October 15, 1999 - "Tr VI"

- 3 -

minutes later.  (Tr II, 53.)  Hall was wearing a white coat, white shoes and dark pants.  (Tr II, 108.)
Chase fell asleep in the car while she was waiting.  (Tr II, 54.)

About an hour later, Chase was awakened when McClam opened the driver's door
and screamed for everyone to get in the car.  (Tr II, 54, 114-15.)  At about the same time, Chase saw
a white car drive into a snow bank.  (Tr II, 116-18.)  The white car had been driven by Hall, who then
got into Chase's car.  (Tr II, 117, 120.)  As they drove away, the three men were screaming, "Those
girls didn't live."  (Tr II, 56.)  When Chase accused them of lying, Hall held up a knife with blood
on it.  (Tr II, 56.)  They stopped at a bridge and threw the knife out of the rear passenger-side
window where Petitioner was sitting.  (Tr II, 57-58, 76.)  After disposing of the knife, they drove to
McClam's uncle's house and then to Chase's father's house, where they got clean clothes.  (Tr II,
58-59.)  They proceeded to Chase's aunt's house, where the three men took showers.  (Tr II, 60.)
While Petitioner and Hall stayed at her aunt's house, Chase and McClam went to get some food and
stopped at Fell Park, where McClam burned all of the clothing he had been wearing that night,
except for his coat.  (Tr II, 61-65.)  After they went back to Chase's aunt's house, the police arrested
McClam and seized his coat and gun.  (Tr II, 65.)

The next day, Chase testified that she saw Petitioner and Hall at Mike Dillard's house.
(Tr II, 67, 137.)  Petitioner said that he wanted a teardrop tattoo on his arm.  (Tr II, 68, 72.)  Chase
believed that a teardrop on your arm meant that you had killed someone.  (Tr II, 73, 144.)  On cross-
examination, Chase acknowledged that a teardrop could also be symbolic of time spent in prison or
a gang affiliation.  (Tr II, 138-39.)  Chase was arrested on January 30.  (Tr II, 74.)  When she was
first interviewed at the jail, she told police that they were at a club in Kalamazoo on the night of
January 27.  (Tr II, 75.)  Chase testified that she initially lied to police because McClam told her to

say that.  (Tr II, 75.)  Chase was granted immunity from charges relating to the events at King's Garden in exchange for her testimony against Petitioner, McClam and Hall.  (Tr II, 73-74.)

Katrina Orr also testified that she was Jamie McClam's girlfriend.  (Tr IV, 246-47, 261.)  Orr saw McClam, Hall and Petitioner on the morning of January 27 at the home of Louise Wise, McClam's aunt.  (Tr IV, 248.)  When Orr told Petitioner that she knew what happened at King's Garden, he said that she had better "keep [her] mouth shut."  (Tr IV, 256.)  Later that evening when Orr and Petitioner were alone, Petitioner implicated McClam in what had happened at King's Garden.  (Tr IV, 247.)  Petitioner told her that the robbery "went bad" and they only got $5.00.  (Tr IV, 257.)  Petitioner spent the night at Orr's house.  (Tr IV, 258.)  In a phone call about a week later, Petitioner told Orr that he was sorry and that the robbery had gone bad.  (Tr IV, 260.)  He denied that he or McClam had done anything to the women, and that he could not believe that Hall had raped one of them.  (Tr IV, 260.)

Gary Sebring testified that he was driving home during the early morning hours of January 27, when he saw smoke pouring out of King's Garden.  (Tr I, 162.)  Sebring pulled into a parking lot and drove down an alley toward the Postumville Pub so he could call 911.  (Tr I, 163.)  As he was going down the alley, two women flagged him down behind King's Garden.  Sebring testified that the women, who were wearing only towels, were covered in blood and badly beaten.  (Tr I, 163.)  After talking to the women, Sebring went to the pub for help.  (Tr I, 163.)  The women said that there were two more women inside the building, but the smoke coming out of the building was so thick that no one could enter.  (Tr I, 164.)  Sebring stayed at the scene until after the fire department and paramedics arrived.  (Tr I, 165.)  He left and went to his mother's house, where he showered and changed his clothes because they had gotten bloody from helping the women.  (Tr I,

165-66.)  While Sebring was driving home from his mother's house, he was pulled over by police.  (Tr I, 166.)  He was interviewed by police and turned over his soiled clothing.  (Tr I, 166.)

Roger Davis testified that he and his friend, Jeff Peterson, were at the Postumville Pub on the night of January 26, 1999.  As they were walking out the door, someone asked them if they owned a white car because someone had just tried to steal it and ran it into a snow bank.  (Tr I, 171-72.)  Just after that, someone pulled up in a truck and asked if they knew the building on the corner was on fire.  (Tr II, 172.)  Davis and Peterson ran down to corner and saw black smoke pouring out of the building.  (Tr II, 172-73.)  As they approached, they found two women and pulled them away from the burning building.  (Tr II, 173-74; Tr III, 57.)  The women appeared badly injured and were not wearing any clothing.  (Tr II, 174.)

Michael Dorr, his wife (Shawn Dorr), and step-son (Andrew Gillum), also were at the Postumville Pub.  As they were walking out the door at about 2:00 a.m., a white car sped through the alley and drove into a snow bank.  (Tr II, 178; Tr III, 41, 50-51.)  Shortly thereafter, they heard someone yelling that King's Garden was on fire.  (Tr II, 180; Tr III, 44, 51.)  When they went over to investigate, they found two women covered in blood.  (Tr II, 182; Tr III, 44, 52.)  The women had little clothing and had cuts all over their bodies.  (Tr III, 44.)  The women indicated that there were two other women in the burning building.  (Tr II, 182; Tr III, 45.)

Yun Hui Catalfamo testified that she owned King's Garden.  (Tr III, 156.)  In January 1999, Catalfamo had two employees: Mal Soon Marcelain and Su Mi Cox (aka "Mickey").  (Tr III, 158.)  Catalfamo's friend, Chin Jo Broderick (aka "Judy"), was also visiting her at that time.  In addition to the three massage rooms, Catalfamo had her own bedroom and Marcelain and Cox shared another bedroom.  (Tr III, 159-60.)  There also was a living room and a kitchen.  (Tr III, 159-160.)

In the early morning hours of January 27, Catalfamo heard the doorbell, which indicated that a customer had entered. (Tr III, 162.) She didn't see anyone at first, but then saw a man coming down the hallway holding a gun to Marcelain's head. (Tr III, 164.) Catalfamo tried to close the door, but the man kicked it in. (Tr III, 164.) There turned out to be three men, one black man and two white men. (Tr III, 164.) Catalfamo identified Petitioner and Jamie McClam as the two white men. (Tr III, 166, 194.) Catalfamo described McClam as the person who was in control and yelled out orders to the other two men. (Tr III, 198.) They took the four women to the kitchen, where they repeatedly kicked them and struck them with a gun. (Tr III, 165.) During the assault, the men cursed at them and demanded money. (Tr III, 168.) Catalfamo testified that she had made a bank deposit earlier in the day and did not have any money to give them. (Tr III, 169.)

Catalfamo testified that the men eventually separated the women. McClam took Catalfamo and Broderick to Catalfamo's bedroom, while Petitioner took Marcelain and Cox to another area. (Tr III, 199.) While they were separated, Catalfamo could hear the other women screaming. At one point, Catalfamo could see Petitioner in the hallway striking Cox in the head with a gun. (Tr III, 166, 199). Catalfamo and Broderick tried to use the wooden platform bed to block the bedroom door, but McClam knocked it back on top of Broderick. McClam proceeded to jump up and down on the bed while Broderick was underneath. Catalfamo never saw or heard anything more from Broderick. (Tr III, 171.) McClam had a knife and used it to cut Catalfamo all over her body. (Tr III, 172.) Catalfamo testified that she passed out several times during the ordeal. (Tr III, 174.) Three times she awoke to find McClam pouring a strong smelling liquid on her. (Tr III, 178.) The liquid smelled like gas and burned her skin. (Tr III, 174.) The last time she awoke, it was quiet except for the sound of a fire. (Tr III, 178.) Catalfamo found Marcelain and they were able to escape

the building.  (Tr III, 179.)  While they were out in the parking lot, Catalfamo could hear Cox screaming for help. (Tr III, 179.)  When Catalfamo got outside, she noticed that her car was gone. (Tr III, 177, 201.)  Catalfamo testified that she and the other women had used cocaine earlier that evening.  (Tr III, 192.)

Mal Soon Marcelain testified that she worked as a masseuse at King's Garden  on January 27, 1999.  (Tr III, 7.)  Marcelain testified that Petitioner and another white man [Jamie McClam] came into King's Garden at about 11:00 p.m. (Tr III, 8.)  Both men were wearing dark clothing and ski hats. (Tr III, 18-20.)  Another masseuse, Su Mi Cox, took Petitioner to her massage room and Marcelain took the other man to her room.  (Tr III, 9.)  When Marcelain asked Petitioner's companion to pay for the massage, he grabbed her around the neck.  (Tr III, 9.)  The man took Marcelain to the kitchen, where Petitioner had already taken Cox and the other two women.  (Tr III, 10.)  Marcelain testified that Petitioner had a gun.  (Tr III, 23.)  According to Marcelain, the two men struck them repeatedly with guns and then starting cutting them with knives.  (Tr III, 10-11.)  At some point, a young black man [Chavez Hall] came in and participated in the assaults.  (Tr III, 11.)

Marcelain testified that after the women were separated, the black man raped her. (Tr III, 13, 25-26.)  Marcelain could not see what was happening to the other women at that point, but could hear them screaming.  (Tr III, 26-27.)  During the assault, which lasted about two hours, the men kept asking for money.  (Tr III, 12.)  The men threatened to kill everyone if they didn't give them the money. (Tr III, 15.)  Marcelain eventually lost consciousness.  (Tr III, 13-14.)  When she awoke, she became aware of the smoke.  (Tr III, 13.)  She felt weak from the beating and loss of blood, but was able to escape through the front door of the building.  (Tr III, 14.)

Marcelain and Catalfamo were treated by paramedics and taken to the hospital. Fire fighters located the other two women inside of the building and they also were transferred to the hospital. Su Mi Cox was declared dead on arrival. (Tr IV, 29.) Cox suffered extensive first and second degree burns. (Tr IV, 72.) She had numerous impact marks on the back of the head where the skin was split. (Tr IV, 72-73.) One blow resulted in a skull fracture. (Tr IV, 73.) She also had a fractured finger and numerous laceration and stab wounds to her arms, hands, back. (Tr IV, 73-74.) While her injuries may have contributed to her death, Cox's primary cause of death was carbon monoxide poisoning and smoke inhalation as a result of the fire. (Tr IV, 75-76.) Cocaine was found in her system. (Tr IV, 82.)

Chin Jo Broderick still had a pulse when she arrived at the hospital, but died within hours from multiple traumatic injuries. (Tr IV, 29-30, 49-50, 68.) Broderick suffered severe burns all over her body. (Tr IV, 64.) She also had lacerations and stab wounds to her scalp, shoulder, arm and legs. (Tr IV, 65-66.) In addition, Broderick had fractures to her left index finger and pelvis. (Tr IV, 66.) The pelvic fracture was severe and resulted in extensive internal bleeding. (Tr IV, 67.) Broderick also had cocaine in her system. (Tr IV, 81.)

Marcelain suffered lacerations and large contusions to her scalp. (Tr IV, 36.) She had fractures to her left elbow and eleventh rib, as well as numerous lacerations to the legs. (Tr IV, 37.) Catalfamo was severely burned and had multiple lacerations to the head, arms, legs. She also sustained a stab wound on the upper back that resulted in a collapsed lung. (Tr IV, 30, 38-40.) In addition, Catalfamo had what appeared to be cigarette burns on her buttocks. (Tr IV, 40.)

Detective David Adams of the Battle Creek Police Department visited Catalfamo two days after the incident. (Tr V, 8.) At that time, she was unable to provide a description of the

- 9 -

suspects.  (Tr V, 8.)  Detective Robert Drewry testified that he presented Catalfamo with a photographic lineup on January 30.  (Tr V, 14, 16.)  Out of six photos, she narrowed it down to three possible individuals, which included Petitioner.  (Tr V, 14-15.)  During Chavez Halls' trial, Catalfamo was shown a board that contained Petitioner's photograph with his name underneath.  (Tr V, 15-17.) Catalfamo gave previous testimony that McClam was the only one who hurt her.  (Tr V, 109-111.)

Kenneth Hersha, a fire investigator with the Michigan State Police and James Moody, the Battle Creek City Fire Marshall, testified as experts in the area of cause and origin of fires.  (Tr III, 237; Tr IV, 99.)  They opined that three separate fires were intentionally set in three different rooms inside King's Garden.  (Tr III, 237-38; Tr IV, 114-16.)  The experts believed that the fire was arson because of the multiple origins, fire patterns, and the lack of accidental cause for the fires.  (Tr IV, 115-116, 120.)  Hersha further testified that the burn patterns were consistent with the use of a flammable liquid, such as bleach.  (Tr III, 238.)  According to Hersha, flammable liquids are often consumed by the fire and water used in fire suppression such that it cannot be detected by testing. (Tr III, 241-42.)  Police officers collected two Clorox bottles from Catalfamo's car, which had been stolen and crashed into a the snow bank.  (Tr III, 247-48.)

After interviewing Chavez Hall, Detectives Michael Wood and Timothy Hurtt recovered a knife in a parking lot near the intersection of Raymond and Porter, and a green and white Nike tennis shoe allegedly worn by Petitioner in a wooded area on East Gogauc.  (Tr IV, 125, 128-29; 135-36.)  A Green Bay Packers jacket allegedly belonging to Petitioner also was seized from a residence at 78 South Wabash.  (Tr IV, 86-87.)

Julie Howenstine testified as an expert in the area of serology.  (Tr IV, 164.)  Hownestine tested the samples contained in the rape kits for Yun Hui Catalfamo and Mal Soon

Marcelain.  With regard to Catalfamo, the underwear sample tested positive for blood, but there was no indication of semen.  (Tr IV, 166.)  As to Marcelain, Howenstine found blood on the vaginal swab and the underwear sample.  She also found semen on the vaginal swabs, vaginal smears and underwear.  (Tr IV, 167.)  Those samples were sent for DNA testing along with known blood samples from the two deceased victims, Chavez, Hall, McClam, Chase and Petitioner.  (Tr IV, 167-69.)  Howenstine tested several other pieces of evidence for the presence of blood.  Several swabs from the Ford Explorer and the Dodge Intrepid gave a positive test for presumptive human blood.  (Tr IV, 174.)  The Nike tennis shoe also tested positive.  (Tr IV, 174.)  Those items that tested positive were also forwarded for DNA testing.  (Tr IV, 175.)

Meghan Clement testified as an expert in DNA analysis.  (Tr V, 29.)  Clement testified that Hall's DNA was found on the vaginal swab taken from Marcelain and in samples taken from her panties. (Tr V, 51-52.)  Catalfamo's DNA was found in samples taken from the knife.  (Tr V, 54.)  Three samples taken from McClam's coat matched the DNA of Broderick (sample A), Marcelain (sample B) and Cox (sample F).  (Tr V, 59-60, 77.)  Three samples also were taken from the gun.  The first samples matched Cox's DNA.  The third sample contained DNA from more than one person, with Broderick being the major contributor. (Tr V, 60.)  The profile obtained from the knife (147-4) was consistent with a mixture of DNA.  Catalfamo, Broderick and Chase were possible contributors.  (Tr V, 61.)  With regard to samples taken from the Nike tennis shoe, Su Mi Cox was the major DNA contributor, but Catalfamo, Broderick and Chase could not be eliminated as minor contributors.  (Tr V, 56-57.)  DNA taken from the Green Bay Packers jacket was consistent with Petitioner.  (Tr V, 67.)

At the conclusion of trial on October 15, 1999, the jury found Petitioner guilty of four counts of assault with intent to do great bodily harm less than murder; four counts of assault with

intent to rob while armed; and one count of conspiracy to commit armed robbery. (Tr VI, 3-6.) On November 19, 1999, Petitioner was sentenced to imprisonment of six to ten years for each of the assault with intent to commit great bodily harm convictions, life imprisonment for each of the assault with intent to rob convictions, and imprisonment of thirty-five to seventy years for the armed robbery conviction. All of the sentences are to be served concurrently. (Sentencing Transcript, 16, docket #24.)

### B. Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals. His brief, which was filed by counsel on September 25, 2000, raised the same nine issues as raised in this application for habeas corpus relief. (*See* Def.-Appellant's Br. on Appeal, docket #27.) By unpublished opinion issued on March 1, 2000, the Michigan Court of Appeals rejected all appellate arguments and affirmed Petitioner's convictions and sentences. (*See* 3/1/00 Mich. Ct. App. Op. (MCOA Op.), docket #27.)

Petitioner filed a *pro per* application for leave to appeal to the Michigan Supreme Court. Petitioner raised the same nine claims raised before and rejected by the Michigan Court of Appeals. By order entered December 4, 2002, the Michigan Supreme Court denied his application for leave to appeal because it was not persuaded that the questions presented should be reviewed. (*See* Mich. Ord., docket #27.)

### Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA). *See Penry v. Johnson*, 532 U.S. 782, 791 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect

- 12 -

to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  The AEDPA has "drastically changed" the nature of habeas review.  *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655.  This Court also may not consider decisions of lower federal courts in determining whether the state decision is contrary to, or an unreasonable application of, clearly established federal law. *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000).  Thus, the inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001).

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the fact of the case; or (4) it either unreasonably extends a legal

principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply. *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003). A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410.

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

## Discussion

### I.

In Ground I, Petitioner claims that he was denied a fair trial when the trial court denied his motion for a change of venue because of pre-trial publicity. It is a "basic requirement of due process" guaranteed by the right to trial by jury that the "criminally accused [receive a] fair trial by a panel of impartial, 'indifferent' jurors." *Goins v. McKeen*, 605 F.2d 947, 951 (6th Cir. 1979)

- 14 -

(citing *Irvin v. Dowd*, 366 U.S. 717, 722 (1961)).  With regard to Petitioner's claims arising from

pre-trial publicity, the Sixth Circuit has recognized the existence of clearly established Supreme

Court authority distinguishing between "cases involving presumed  prejudice - when the setting of

the trial is inherently prejudicial, - and actual prejudice - when review of both the jury *voir dire*

testimony and the extent and nature of media coverage indicates a fair trial was impossible." *Ritchie*

*v. Rogers*, 313 F.3d 948, 952 (6th Cir. 2002) (internal quotations and citations omitted); *see also*

*Nevers v. Killinger*, 169 F.3d 352 (6th Cir. 1999), *abrogated on other grounds by Harris*, 212 F.3d

at 943.

        The Supreme Court first acknowledged the distinction between actual and presumed

prejudice in *Murphy v. Florida*, 421 U.S. 794 (1975).  The Court discussed three previous cases in

which it found circumstances warranting a presumption of prejudice: *Rideau v. Louisiana*, 373 U.S.

723 (1963), *Estes v. Texas*, 381 U.S. 532 (1965) and *Sheppard v. Maxwell*, 384 U.S. 333 (1966).

*Rideau* involved the televising of an in-jail 20-minute interrogation of the defendant by the police

in which the defendant confessed to the murder for which he was subsequently convicted. The Court

concluded that Rideau presumptively could not have received a fair trial in that parish "because it

considered the trial under review 'but a hollow formality'--the real trial had occurred when tens of

thousands of people, in a community of 150,000, had seen and heard the defendant admit his guilt

before the cameras." *Murphy*, 421 U.S. at 799.  The trial in *Estes* had been conducted in a "circus

atmosphere," where the courtroom was overrun with television equipment.  *Murphy*, 421 U.S. at

799.  *Sheppard* similarly involved extremely inflammatory publicity, as well as a carnival-like

atmosphere in the courtroom created by the media presence.  *Murphy*, 421 U.S. at 799.  Referring

to *Estes* and *Shepard*, the Court stated:

- 15 -

> The proceedings in these cases were entirely lacking in the solemnity and sobriety to which a defendant is entitled in a system that subscribes to any notion of fairness and rejects the verdict of a mob. They cannot be made to stand for the proposition that juror exposure to information about a state defendant's prior convictions or to news accounts of the crime with which he is charged alone presumptively deprives the defendant of due process.

*Murphy*, 421 U.S. at 799.

In the absence of the "televised confession amounting to a trial" or "carnival atmosphere," actual prejudice may be inferred from the nature and extent of the publicity and the juror voir dire testimony. *Ritchie*, 313 F.3d at 955. The Supreme Court made such a finding of actual prejudice in *Irvin v. Dowd*, 366 U.S. 717 (1961). In *Irvin*, the defendant was tried in a small community that was widely aware of his prior convictions, his confession to 24 burglaries and six murders (including the one for which he stood trial) and his unaccepted offer to plead guilty in order to avoid a death sentence. *Murphy*, 421 U.S. at 798. In addition to this prejudicial information before the trial began, eight of the twelve empaneled jurors had already formed the opinion that the defendant was guilty. *Id.* Furthermore, 268 of the 430 venire men were excused because they indicated an opinion as to the petitioner's guilt. In reaching its decision in *Irvin*, the Supreme Court noted:

> To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

*Irvin*, 366 U.S. at 722-23. Nevertheless, "the juror's assurances that he is equal to the task cannot be dispositive of the accused's rights, it remains open to the defendant to demonstrate 'the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality.'" *Murphy*, 421 U.S. at 800 (*quoting Irvin*, 366 U.S. at 723). After discussing the facts of *Irvin*, the

- 16 -

*Murphy* Court noted, " In these circumstances, the [*Irvin*] Court readily found actual prejudice against the petitioner to a degree that rendered a fair trial impossible." *Murphy*, 421 U.S. at 798.

Comparing the facts in *Murphy*, where the petitioner claimed that the jury had learned of a prior conviction and certain facts about the crime at issue due to extensive pre-trial media coverage, the Supreme Court found "no such hostility to petitioner by the jurors who served in his trial as to suggest a partiality that could not be laid aside." *Murphy*, 421 U.S. at 799.  In *Murphy*, for example, only 20 of the 78 venire men were excused because they had formed an opinion as to the petitioner's guilt.  The Supreme Court followed both the principles and result of *Murphy* in two subsequent cases concerning extensive pre-trial publicity:  *Dobbert v. Florida*, 432 U.S. 282 (1977) and *Patton v. Yount*, 467 U.S. 1025 (1984).  Dobbert, who was accused of torturing and murdering his children, claimed that he was denied a fair trial as the result of excessive press coverage.  The Supreme Court disagreed, stating:

> Petitioner's argument that the extensive coverage by the media denied him a fair trial rests almost entirely upon the quantum of publicity which the events received. He has directed us to no specific portions of the record, in particular the voir dire examination of the jurors, which would require a finding of constitutional unfairness as to the method of jury selection or as to the character of the jurors actually selected. But under *Murphy*, extensive knowledge in the community of either the crimes or the putative criminal is not sufficient by itself to render a trial constitutionally unfair. Petitioner in this case has simply shown that the community was made well aware of the charges against him and asks us on that basis to presume unfairness of constitutional magnitude at his trial. This we will not do in the absence of a "trial atmosphere . . . utterly corrupted by press coverage," *Murphy v. Florida, supra*, 421 U.S., at 798, 95 S. Ct., at 2035. One who is reasonably suspected of murdering his children cannot expect to remain anonymous. Petitioner has failed to convince us that under the "totality of circumstances," *Murphy, supra*, the Florida Supreme Court was wrong in finding no constitutional violation with respect to the pretrial publicity.

*Dobbert*, 432 U.S. at 303.  *Patton* similarly involved the much publicized case of a high school teacher accused of raping and murdering one of his female students.  After reviewing the extent and

- 17 -

nature of the pretrial publicity and the *voir dire* testimony, the Court again concluded that "the jurors at Yount's trial had [not had] such fixed opinions that they could not judge impartially the guilt of the defendant." *Patton*, 467 U.S. at 1035.

In this case, the Michigan Court of Appeals concluded that Petitioner was not deprived a fair trial as the result of the trial court's denial of his motion to change venue, stating:

> Defendant first contends that the trial court erred in denying his motion for a change of venue on the basis of pretrial publicity. A motion for a change of venue is addressed to the trial court's discretion and the court's ruling will not be disturbed on appeal absent a palpable abuse of that discretion. *People v Jendrzejewski*, 455 Mich 495, 500; 566 NW2d 530 (1997). Having reviewed the extensive jury voir dire conducted in this case, we conclude that defendant failed to show either (1) the existence of strong community feelings against him and that the publicity was so extensive that jurors could not remain impartial when exposed to it, or (2) that the jurors actually were prejudiced or the atmosphere surrounding the trial was such as would create the probability of prejudice. *Jendrzejewski*, *supra* at 500-501; *People v Hack*, 219 Mich App 299, 311; 556 NW2d 187 (1996). Accordingly, we conclude that the trial court did not abuse its discretion in denying defendant's request for a change of venue.

(MCOA Op. at 1.)[2]

This case clearly does not present those rare circumstances in which the criminal proceedings were so utterly corrupted by media coverage that prejudice must be presumed. Unlike *Estes* and *Shepard*, this case did not involve a media-created carnival atmosphere in the courtroom during trial, nor did it involve the televising of a videotaped confession as found in *Rideau*. Accordingly, Petitioner is not entitled to a presumption of prejudice. Instead, the Court must consider whether actual prejudice may be inferred from the nature and extent of the publicity and the juror voir dire testimony. *See Ritchie*, 313 F.3d at 955.

_____

[2]The case cited by the court of appeals, *People v. Jendrzejewski,* 566 N.W.2d 530 (Mich. 1977), relied heavily upon *Irvin*, *Murphy* and other relevant United States Supreme Court authority.

- 18 -

Petitioner claims that this case received extensive newspaper and television news coverage. According to Petitioner, the local television station, WWMT has 112,000 adult viewers, which represents 9% of the population. The local newspaper, the Battle Creek Enquirer, has a circulation of 27,000 or 23% of the population. Petitioner claims that forty-eight news articles appeared in the Battle Creek Enquirer related to this case. Most of the articles provided by Petitioner are undated, but appeared sometime during the nine-month period between the date of the offenses on January 27, 1999, and the beginning of Petitioner's trial on October 6, 1999. Therefore, on average, a newspaper article related to this case appeared once every five days during that period. Many of the articles covered the initial events at King's Garden, and the arrests and prosecution of Petitioner, McClam and Hall. However, several of the articles focused on broader issues surrounding massage parlors and massage therapists, rather than the specific facts of this case. The articles contain nothing of a nature so inherently prejudicial that a juror would be unable to disregard it. The nature of the publicity and whether it is the sort that could be laid aside by jurors, rather than its volume, is the crucial factor to be considered. *See Murphy*, 421 U.S. 794. In particular, knowledge that the defendant has confessed, prominent in *Irvin* and absent in this case, has always been regarded as especially prejudicial. *See, e.g.*, *Rideau*, 373 U.S. 723; *Goins v. McKeen*, 605 F.2d 947 (6th Cir. 1979).

A review of the jury *voir dire* testimony also fails to reveal a "community deeply hostile to the accused." *Murphy*, 421 U.S. at 803. During *voir dire*, each of the jurors was asked whether they knew any facts of the case other than what they had heard in court that day. The trial court excused only six jurors for cause after they indicated that they had formed a conclusion as to Petitioner's guilt as the result of pretrial media exposure. (Tr I, 17, 19, 115-16, 148, 149, 196.) In

*Murphy,* where twenty jurors were dismissed for cause, the Supreme Court commented, "This may indeed be 20 more than would occur in the trial of a totally obscure person, but it by no means suggests a community with sentiment so poisoned against petitioner as to impeach the indifference of jurors who displayed no animus of their own." 421 U.S. at 803. Consequently, the fact that six jurors were excused in this case falls far short of demonstrating actual prejudice.

Of the fourteen people ultimately selected to serve as jurors in Petitioner's case, half of them had not heard or read anything about the case. (Tr I,  69 (Juror #14); 149 (Juror #10); 159 (Juror #13); 168 (Juror #9); 193 (Juror #1); 198 (Juror #3); 207 (Juror #8)).  The majority of jurors who had seen television or newspaper coverage of the crime indicated that they did not recall specific facts or details of the crime or Petitioner's involvement.  The seven jurors who had some knowledge of the case were asked whether they had formed any conclusions as to the guilt or innocence of Petitioner, and whether they could reach a fair and impartial verdict based on the evidence.  Each of the jurors responded that he or she could be fair and impartial.  (Tr I, 53 (Juror #7); 63 (Juror #2); 123 (Juror #12); 136 (Juror #6); 141 (Juror #11); 173 (Juror #4); 203 (Juror #5)).

Petitioner could not expect to remain anonymous given the brutal nature of the crimes that took place at King's Garden.  As the Supreme Court stated in *Dobbert*, 432 U.S. at 303, the fact that the community was well aware of the crime is not sufficient by itself to render a trial constitutionally unfair.  Neither the media coverage nor the jury voir dire in this case reveal a climate of hostility in the community that rendered the jurors unable to decide Petitioner's case fairly and impartially.  Accordingly, I cannot find that the state court's decision regarding the impartiality of the jury was contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

II.

In his second ground for relief, Petitioner claims that his due process rights were violated when the trial court denied his motion to suppress the in-court identification by one of the victims, Yun Hui Catalfamo. Detective David Adams of the Battle Creek Police Department visited Catalfamo two days after the incident. (Tr V, 8.) At that time, she was unable to provide a description of the suspects. (Tr V, 8.) The following day, January 30, Detective Robert Drewry presented Catalfamo with a photographic lineup. (Tr V, 14, 16.) Out of six photos, she narrowed it down to three possible individuals, which included Petitioner. (Tr V, 14-15.) During Chavez Hall's trial, the prosecution displayed a board containing the photos of all three co-defendants with their names underneath. Ms. Catalfamo pointed to the photos of the various co-defendants during her testimony. (Tr V, 15-17.) Petitioner made a pretrial motion to suppress Catalfamo's in-court identification testimony on the ground that it was impermissibly tainted by the previous suggestive identification. (Motion to Suppress Transcript, docket #16.) The trial court denied Petitioner's motion.

On appeal, the Michigan Court of Appeals found no error in the admission of Catalfamo's in-court identification:

> Defendant next argues that he was deprived of his right to due process when the court denied his motion to exclude an in-court identification by one of the victims. Defendant maintains that the in-court identification was tainted because at a prior trial of a codefendant the victim was shown a photograph with defendant's name underneath. We review for clear error a trial court's decision to admit identification evidence. A decision is clearly erroneous when the reviewing court is left with a definite and firm conviction that a mistake has been made. *People v Barclay*, 208 Mich App 670, 675; 528 NW2d 842 (1995). Even assuming that the victim underwent an improperly suggestive pretrial photographic lineup procedure, our review of the totality of the circumstances demonstrates that a sufficient independent basis supported the victim's in-court identification of defendant. *People v Gray*, 457 Mich 107, 114-117; 577 NW2d 92 (1998); *People v Davis*, 241 Mich App 697, 702-

- 21 -

703; 617 NW2d 381 (2000). Consequently, the trial court did not err in permitting the victim to identify defendant during his trial.

(MCOA Op. at 1-2.)

The Supreme Court has held that an identification violates a defendant's right to due process where the identification procedure was so unnecessarily suggestive as to run the risk of irreparable mistaken identification. *Stovall v. Denno*, 388 U.S. 293, 301-02 (1967); *Neil v. Biggers*, 409 U.S. 188 (1972); *see also Thigpen v. Cory*, 804 F.2d 893, 895 (6th Cir. 1986). "It is the likelihood of misidentification which violates a defendant's right to due process." *Neil*, 409 U.S. at 198. As the Supreme Court has stated, "reliability is the linchpin in determining the admissibility of identification testimony." *Manson v. Braithwaite*, 432 U.S. 98, 114 (1977). The test for evaluating whether an allegedly suggestive pre-trial identification casts an impermissible taint on a later in-court identification contains two steps. *Ledbetter v. Edwards*, 35 F.3d 1062, 1070-71 (6th Cir. 1994). First, the court must decide whether the procedure was unduly suggestive. *Id.* If the procedure was unduly suggestive, the next step is to determine whether, in light of all the circumstances, the identification was nonetheless reliable. *Id.* at 1071. *See Manson*, 432 U.S. at 105, 106-07; *Neil*, 409 U.S. at 198-99. If an identification is reliable, it will be admissible even if the confrontation was suggestive. *Manson*, 432 U.S. at 114; *Carter v. Bell*, 218 F.3d 581, 605 (6th Cir. 2000).

I will assume, *arguendo,* that the photo identification at Chavez Hall's trial was impermissibly suggestive, particularly when Catalfamo previously had been unable to make a positive identification of Petitioner, *see United States v. Emanuele*, 51 F.3d 1123, 1131 (3d Cir. 1995) (holding that an in-court identification by eyewitness who could not recognize defendant in pretrial photo array, coupled with highly suggestive viewing of the defendant in conditions "reeking

- 22 -

of criminality" bolstered by the comments of the other witness was unreliable and should not have been admitted); *Thigpen*, 804 F.2d at 896-98 (holding that in-court identification of defendant in courtroom violated defendant's right to due process where eyewitness had failed to identify defendant in pretrial lineup and had viewed defendant at pretrial court proceeding), since respondent concedes that "[i]dentification at a prior court proceeding obviously has suggestive characteristics." Respondent argues, however, that it was not unreasonable for the Michigan Court of Appeals to find sufficient indicia of reliability to support the admission of the evidence.  (Answer in Opposition, 8, docket #31.)

In judging reliability, the Court must consider the totality of the circumstances, including the factors described in *Manson* and *Biggers*: (1) the opportunity of the witness to view the defendant at the initial observation; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the defendant; (4) the level of certainty shown by the witness at the pretrial identification; and (5) the length of time between the initial observation and the identification. *Manson*, 432 U.S. at 114; *Biggers*, 409 U.S. at 199-200.  The Court must weigh these factors against any "corrupting effect of the suggestive identification."  *Manson*, 432 U.S. at 114.

With regard to the first factors, the events giving rise to this case lasted more than an hour.  Catalfamo testified that Petitioner and the other men initially took her and the other victims to the kitchen, where they kicked and beat them.  (Tr III, 164.)  Catalfamo had considerable time to observe Petitioner even though the perpetrators eventually separated the women and took them to separate areas.  (Tr III, 168-69.)   There is no evidence the defendants attempted to conceal their appearances.  McClam eventually took Catalfamo and Broderick to Catalfamo's bedroom, while Petitioner took Cox and Marcelain to another area.  (Tr III, 168-69; 199.)  Catalfamo's opportunity

- 23 -

to see petitioner was not a casual or passing one.  As Catalfamo was the ongoing victim of a heinous and brutal crime, her degree of attention was undoubtedly focused on what was going to happen to her and was unquestionably high. The third factor is more difficult to assess.  Two days after the events, Catalfamo was unable to provide a description of the suspects to police.  The reason for this is not entirely clear, and it could have been due to trauma or fear.  The victim was still in a lot of pain, and only in fair condition.  (Tr V, 8.)  Indeed, Catalfamo and the other girl would not even tell the police the full names of the two deceased victims.  (Tr V, 11.)  Also, Catalfamo was unable to identify defendant with certainty in a photo lineup, although when presented with an array of six photos three days after the events, she was able to narrow it down to three possible individuals, which included Petitioner.  The final factor was the length of time between the initial observation and the challenged identification.  In this case, the initial observation occurred on January 26 or 27, 1999 and the in-court identification was made nine months later on October 23, 1999.  A nine month delay between the crime and the confrontation also weighs against a finding of reliability.  *See Biggers*, 409 U.S. at 201 (lapse of seven months between crime and confrontation "would be a seriously negative factor in most cases").

Under totality of circumstances, including *Manson* and *Biggers* factors, it was not unreasonable for the Michigan Court of Appeals to find that  Catalfamo's in-court identification was sufficiently reliable to protect Petitioner's due process rights.  As stated above, the AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998).  A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656.  This presumption of correctness

is accorded to findings of state appellate courts, as well as the trial court.  *See Sumner v. Mata*, 449

U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).  Petitioner has not

rebutted this presumption by the high standard of clear and convincing evidence, and this court is

not free to substitute its judgment for that of the state appellate court.

   Nevertheless, in-court identifications are subject to the harmless error analysis.

*United States v. Wade*, 388 U.S. at 242.  Even were this court to find the identification unreliable,

in order for this Court to find that the admission of this evidence was not harmless, it must find that

the trial court's error "had substantial and injurious effect or influence in determining the jury's

verdict."  *See Nevers*, 169 F.3d at 371 (holding that *Brecht v. Abrahamson*, 507 U.S. 619, 623

(1993), standard continues to apply on habeas review even after the amendments to the AEDPA);

*see also Penry*, 532 U.S. at 784 (applying *Brecht* standard in § 2254).  The habeas petitioner must

establish that the error resulted in actual prejudice.  *McGhee v. Yukins*, 229 F.3d 506, 513 (6th Cir.

2000).  The harmless error standard announced in *Brecht* applies even if a federal habeas court is the

first to review for harmless error.  *Gilliam v. Mitchell*, 179 F.3d 990, 995 (6th Cir. 1999).

   Angela Chase, Katrina Orr and Mal Soon Marcelain provided strong evidence of

Petitioner's identity as one of the participants in the King's Garden robbery.  Angela Chase testified

that she had known Petitioner, McClam and Hall for several months prior to the events at issue in

this case.  On the evening of January 26, 1999, the four of them drove around in Chase's Ford

Explorer.  (Tr II, 43-44, 86, 90-99).  When they were driving in the vicinity of King's Garden at

about 12:30 a.m., McClam asked whether they wanted to "hit a lick."  (Tr II, 50-51, 99.)  Chase took

that to mean that McClam wanted to get money or have sex.  (Tr II, 50, 100.)  McClam, who was

driving at the time, parked near King's Garden.  (Tr II, 52, 104.)  Chase testified that McClam and

Petitioner got out of the car and went into King's Garden.  (Tr II, 53.)  According to Chase, Petitioner was wearing a Green Bay Packers coat and green Nikes.  (Tr II, 53, 76.)  As he had been instructed by McClam, Hall went into King's Garden a few minutes later.  About an hour later, Chase was awakened when McClam opened the driver's door and screamed for Petitioner and Hall to get in the car.  (Tr II, 54, 114-15.)  As they drove away, all three men were screaming, "Those girls didn't live."  (Tr II, 56.)  When Chase accused them of lying, Hall held up a knife with blood on it. (Tr II, 56.)

Katrina Orr also provided evidence of Petitioner's identity.  Orr testified that she saw McClam, Hall and Petitioner on the morning of January 27.  (Tr IV, 248.)  When Orr told Petitioner that she knew what happened at King's Garden, he said that she had better "keep [her] mouth shut." (Tr IV, 256.)  Later that evening when Orr and Petitioner were alone, Petitioner implicated McClam in what had happened at King's Garden.  (Tr IV, 247.)  Petitioner told Orr that the robbery "went bad" and they only got $5.00.  (Tr IV, 257.)  In a phone call about a week later, Petitioner told Orr that he was sorry and that the robbery had gone bad, although he denied that he or McClam had done anything to the women.  (Tr IV, 260.)

The only other surviving victim besides Catalfamo, Mal Soon Marcelain, positively identified Petitioner as one of the three men who robbed, beat and cut her and the three other women. (Tr III, 8.)  Marcelain testified that Petitioner and a second man came into King's Garden at about 11:00 p.m.  (Tr III, 8.)  Su Mi Cox took Petitioner to her massage room and Marcelain took the other man to her room.  (Tr III, 9.)  When Marcelain asked Petitioner's companion to pay for the massage, he grabbed her around the neck.  (Tr III, 9.)  The man took Marcelain to the kitchen, where Petitioner had already taken Cox and the other two women.  (Tr III, 10.)  Marcelain testified that Petitioner had

a gun.  (Tr III, 23.)  According to Marcelain, the Petitioner and a second man repeatedly struck them in the head with guns and then began cutting them with knives.  (Tr III, 10-11.)  At some point, a third man joined in the assaults.  (Tr III, 11.)  Marcelain  testified that the men continued to demand money throughout the assault.  (Tr III, 12.)  They threatened to kill the women if they did not give them the money.  (Tr III, 15.)

Petitioner also was linked to the crime through physical evidence.  Blood from one of the victims, Su Mi Cox, was found on a Nike tennis shoe belonging to Petitioner.  (Tr II, 53, 76; Tr IV, 135-36; Tr V, 56-57.)  Testimony from the physicians who treated the victims confirmed that each of the women suffered multiple cuts and stab wounds all over their bodies.  (Tr IV, 29-81.) Marcelain also sustained large contusions to the back of her head, while Cox had numerous impact marks in the back of her head and suffered a skull fracture.  (Tr IV, 36, 72-73.)

Therefore, the prosecutor presented overwhelming evidence of Petitioner's identity as one of the perpetrators and of his guilt for the robbery and assaultive crimes for which he was convicted.  In light of the evidence of Petitioner's guilt, I cannot find that an erroneous admission of Catalfamo's in-court identification of Petitioner, if it was erroneous, had a substantial and injurious effect or influence on the jury's verdict.

### III.

In Ground III, Petitioner contends that the trial court violated his due process rights when it denied  his motion for an expert witness and for certain discovery.  Specifically, Petitioner requested funds to retain a pharmacology or toxicology expert to testify regarding the effect of crack cocaine on a person's ability to recall events.  In addition, Petitioner moved for discovery of any records  concerning  disciplinary  action  taken  against  any  of  the  prosecutor's  scientific  expert

witnesses.  The trial court denied Petitioner's motion for funds to pay an expert because there was insufficient evidence concerning how much cocaine was used by any of the victims, and when it was used.  The Court also pointed out that it was up to the jury to assess the credibility of the victims' identification testimony.  (8/30/99 Hearing Tr., 11, docket #15.)  The trial court further held that any records concerning disciplinary action taken against any of the scientific experts were irrelevant.  (*Id.* at 16-18.)  The Michigan Court of Appeals affirmed the trial court, stating:

> We next conclude that the trial court did not abuse its discretion when it denied two of defendant's requests for discovery. *People v Lemcool (After Remand)*, 445 Mich 491, 497; 518 NW2d 437 (1994). We note that the court correctly allowed discovery of evidence to the extent relevant under MRE 609 and that defendant expressed satisfaction with the court's ruling.  Furthermore, defendant failed to adequately demonstrate his need for an expert regarding the effects of crack cocaine on a person's ability to remember or recall events. *People v Maranian*, 359 Mich 361, 368; 102 NW2d 568 (1960); *People v Tomko*, 202 Mich App 673, 679; 509 NW2d 868 (1993).

(MCOA Op. at 2.)

The Supreme Court has recognized the general principle that the government must provide indigent defendants with the "basic tools of an adequate defense or appeal, when those tools are available for a price to other prisoners."  *Britt v. North Carolina*, 404 U.S. 226, 227 (1971); *see Douglas v. California*, 372 U.S. 353, 357-58 (1963); *Griffin v. Illinois*, 351 U.S. 12, 18-19 (1956) (plurality opinion). Although the government need not purchase for the indigent defendant all the assistance that a wealthier defendant might buy, fundamental fairness requires that indigent defendants have "an adequate opportunity to present their claims fairly within the adversary system." *Ross v. Moffitt*, 417 U.S. 600, 612 (1974).  In *Ake v. Oklahoma*, 470 U.S. 68 (1985), the Supreme Court held that as part of the basic tools of an adequate defense, an indigent defendant has a due process right to the appointment of a psychiatrist to assist him in his defense when he "demonstrates

to the trial judge that his sanity at the time of the offense is to be a significant factor at trial." *Id.* at 83.   Shortly after deciding *Ake*, the Supreme Court declined to extend *Ake*'s holding to the appointment of a criminal investigator, fingerprint expert, and ballistics expert and declined to address the question of "what if any showing would [entitle] a defendant to [private non-psychiatric] assistance" as a matter of federal constitutional law. *Caldwell v. Mississippi*, 472 U.S. 320, 323 n. 1 (1985) (emphasis added); *see also Hawkins v. Mullins*, 291 F.3d 658, 671 (10th Cir. 2002) (construing *Caldwell* as declining to extend the *Ake* holding); *Weeks v. Angelone*, 176 F.3d 249, 264-65 (4th Cir. 1999) (same).

In habeas corpus cases decided before the enactment of the AEDPA, federal circuit courts, including the Sixth Circuit, extended *Ake* to non-psychiatric experts.   For example, in *Terry v. Rees*, 985 F.2d 283, 284 (6th Cir. 1993), the Sixth Circuit held that the petitioner was deprived of the opportunity to present an effective defense when he was denied an independent pathologist in order to challenge the government's position as to the victim's cause of death.   With the enactment of the AEDPA in 1996, the petition for writ of habeas corpus may be granted only if the decision of the state court "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States."   Many federal circuit courts have acknowledged that the  Supreme Court has not explicitly extended *Ake* to non-psychiatric experts. *See Conklin v. Schofield*, 366 F.3d 1191, 1206 (11th Cir. 2004) ("[T]he Supreme Court has not yet extended *Ake* to non-psychiatric experts."), *cert. denied*, 125 S. Ct. 1703 (2005); *Hawkins*, 291 F.3d at 671 (The Supreme Court has not "specifically" extended *Ake* to investigators and other experts).   Therefore, it is an open question whether the holding in *Ake* applies to requests for non-psychiatric experts. *See Briseno v. Cockrell*, 274 F.3d

204, 208-10 (5th Cir. 2001) (recognizing that it remains an unsettled question whether the holding in *Ake* applies to requests for expert assistance outside the field of psychiatry).  Because the Supreme Court has not extended *Ake* to require the appointment of non-psychiatric experts, Petitioner cannot show that the failure to provide funds for a pharmacology or toxicology expert was contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

Petitioner also argues that his due process rights were violated when the trial court denied his motion for discovery of any records concerning disciplinary action that had ever been taken against any of the prosecutor's scientific expert witnesses.  *See Brady v. Maryland*, 373 U.S. 83 (1963).  As a general proposition, "[t]here is no general constitutional right to discovery in a criminal case, and *Brady* did not create one . . . ."  *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977). Rather, *Brady* is concerned only with cases in which the government possesses information which the defendant does not, and the government's failure to disclose the information deprives the defendant of a fair trial.  Reversal is only required, therefore, where "there is a 'reasonable probability' that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine the confidence in the outcome."  *United States v. Bagley*, 473 U.S. 667, 682 (1985). Furthermore, the *Brady* rule only applies to "the discovery, after trial, of information which had been known to the prosecution but unknown to the defense."  *United States v. Agurs*, 427 U.S. 97, 103 (1976) (emphasis added).

The decision of the state court clearly did not violate *Brady*.  Petitioner's discovery request was nothing more than a fishing expedition.  Petitioner does not allege that the prosecutor was aware of any disciplinary action taken against any of the scientific experts in their handling of evidence in this or any other criminal matter, or that the prosecutor possessed documents concerning

- 30 -

any such disciplinary action.   Accordingly, Petitioner cannot accuse the prosecutor of failing to disclose evidence favorable to the defense.   Petitioner, therefore, cannot establish that the decision of the state court was an unreasonable application of clearly established Supreme Court precedent.

IV.

In Ground IV, Petitioner contends that the trial court violated his right to due process when it allowed Angela Chase to testify that Petitioner wanted to get a teardrop tattoo, which signified that he had killed someone.   After a separate record was made of Chase's testimony, the trial court overruled defense counsel's objection.   Chase testified before the jury that Petitioner told her that he wanted a teardrop tattoo on his arm. (Tr II, 68, 72.)   Chase believed that a teardrop on your arm meant that you had killed someone.   (Tr II, 73, 144.)   On cross-examination, Chase acknowledged that a teardrop could also be symbolic of time spent in prison or a gang affiliation. (Tr II, 138-39.)   Petitioner argues that the probative value of the evidence was far outweighed by the danger of unfair prejudice.   The Michigan Court of Appeals found that the trial court had not abused its discretion by allowing the testimony:

> The next issue arises from a witness' testimony at trial that a teardrop tattoo signified that the person with the tattoo had killed someone. Defendant asserts that the trial court improperly admitted evidence that following the charged offenses he expressed a desire to obtain a teardrop tattoo. We review for a clear abuse of discretion the trial court's decision to admit evidence. *People v Lukity*, 460 Mich 484, 488; 596 NW2d 607 (1999). This evidence was probative of defendant's state of mind and possible participation in the charged offenses. MRE 401; *People v Abraham*, 234 Mich App 640, 656; 599 NW2d 736 (1999). Additionally, the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice; defendant offers no explanation of what unfair prejudice occurred beyond speculating regarding the evidence's emotional impact on the jury. MRE 403; *People v Fisher*, 449 Mich 441, 451-452; 537 NW2d 577 (1995); *People v Meadows*, 175 Mich App 355, 361; 437 NW2d 405 (1989).

(MCOA Op. at 2.)

The extraordinary remedy of habeas corpus lies only for a violation of the Constitution. 28 U.S.C. § 2254(a). As the Supreme Court explained in *Estelle v. McGuire*, 502 U.S. 62 (1991), an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions." *Id.* at 67-68. Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id.* at 68. State-court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental. *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000); *accord Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). This approach accords the state courts wide latitude in ruling on evidentiary matters. *Seymour*, 224 F.3d at 552.

Petitioner was not denied a fundamentally fair trial as the result of Chase's testimony. Defense counsel was permitted to cross-examine Chase regarding other possible meanings for a teardrop tattoo. Moreover, the jury clearly did not rely on that portion of Chase's testimony. Had the jury relied upon Chase' testimony that the tattoo signified that Petitioner had killed someone, they would have found Petitioner guilty of murder. Instead, Petitioner was convicted of four counts of assault with intent to do great bodily harm less than murder, four counts of assault with intent to rob while armed, and one count of conspiracy to commit armed robbery. The prosecutor presented strong evidence that Petitioner was guilty of the offenses for which he was convicted.

V.

Petitioner contends in his fifth ground for relief that his due process rights were violated when the photographic line-up was conducted without the presence of counsel.  As discussed in Section II above, Detective Robert Drewry presented Yun Hui Catalfamo with a photographic lineup on January 30, before Petitioner was taken into custody.  (Tr V, 14, 16.)  The Michigan Court of Appeals concluded that Petitioner had no right to counsel at the photographic lineup, stating:

> Contrary to defendant's next, *unpreserved* contention, defendant had no right to counsel at the photographic showup that was conducted with one of the victims before defendant was taken into custody. *People v Williams*, 244 Mich App 533, 539-540; 624 NW2d 575 (2001); *People v Lee*, 243 Mich App 163, 181-182; 622 NW2d 71 (2000).

(MCOA Op. at 2) (emphasis added).  The Michigan Court of Appeals refers to Petitioner's claim as "unpreserved."  Under Michigan law, a  claim is unpreserved if it was not raised in the trial court. *See People v. Russel*, 266 Mich. App. 307, 314; 703 N.W.2d 107 (2005).  When a state-law default prevents further state consideration of a federal issue, the federal courts ordinarily are precluded from considering that issue on habeas corpus review unless the Petitioner can show cause and prejudice. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991); *Engle v. Isaac*, 456 U.S. 107 (1982).  To determine whether a petitioner procedurally defaulted a federal claim in state court, the Court must consider whether: (1) the petitioner failed to comply with an applicable state procedural rule; (2) the last state court rendering judgment on the claim at issue actually enforced the state procedural rule so as to bar that claim; and (3) the state procedural default is an "independent and adequate" state ground properly foreclosing federal habeas review of the federal constitutional claim.  *See Hicks v. Straub,* 377 F.3d 538, 551 (6th Cir. 2004), *cert. denied*, 125 S. Ct. 1653 (2005); *accord Lancaster*, 324 F.3d at 436-37; *Greer v. Mitchell*, 264 F.3d 663, 672 (6th Cir. 2001).

- 33 -

While the Michigan Court of Appeals referred to the claim "unpreserved," the court did not specifically state that Petitioner's claim was barred from review as a result of his failure to raise the issue in the trial court.   Instead, the court of appeals addressed the merits of Petitioner's claim.  As a result, it is not clear whether the Michigan Court of Appeals relied upon the default in disposing of Petitioner's claim.  A procedural default does not bar consideration of a federal claim on habeas corpus review unless the last state court rendering a reasoned opinion in the case "clearly and expressly states that its judgment rests on a state procedural bar." *Harris v. Reed*, 489 U.S. 255, 263 (1989) (citation and internal quotation marks omitted).  Because the Michigan Court of Appeals did not clearly and expressly state that its judgment rested on state procedural bar, I conclude that Petitioner is not procedurally barred from pursuing this claim.  *Id.; see also Patterson v. Haskins*, 316 F.3d 596, 604-605 (6th Cir. 2003).

Turning to the merits of Petitioner's claim, the United States Supreme Court has held that there is no federal constitutional right to representation by counsel at a photographic display, at least to determine whether a trial witness will be able to make an in-court identification of the defendant. *See United States v. Ash*, 413 U.S. 300, 321 (1973).  In his brief, Petitioner acknowledges that "the presence of counsel for defendant at a pretrial photographic identification is not required as a matter of federal constitutional law," but argues that the presence of counsel is mandated under Michigan law.  (Petitioner's Brief in Support, 22, docket #2.)  As stated above, a habeas court may only remedy violations of federal law. *See Estelle*, 502 U.S.  at 67-68.  Moreover, in order to grant habeas corpus relief, the Court must find that the decision of the Michigan Court of Appeals is an unreasonable application of Supreme Court precedent.  In light of the Supreme Court's decision in *Ash*, Petitioner cannot make such a showing.

- 34 -

VI.

In Ground VI, Petitioner claims that his due process rights were violated when Detective Hurtt testified regarding statements made to him by Chavez Hall pertaining to where Petitioner's tennis shoe could be found.  Petitioner makes a related claim in Ground IX that the admission of Hall's statement constituted a violation of the Confrontation Clause under the Supreme Court's decision in *Bruton v. United States*, 391 U.S. 123 (1968).

Detective Hurtt testified that after he interviewed Chavez Hall:

> Myself and Detective Adams along with Chavez Hall we went to the area of Raymond and Porter where we had been told some evidence, more specifically a knife had been disposed of at that area.  After leaving the area of Raymond and Porter, we went on an area on Goguac, East Goguac near the intersection of Arthur where we had been told a tennis shoe that was worn by Darrin Mills [Petitioner] had been disposed of.

(Tr IV, 135-36.)  Defense counsel objected to Hurtt's testimony on the ground that it was hearsay offered to corroborate Angela Chase's testimony that the tennis shoe belonged to Petitioner.  (Tr IV, 139-142.)  The trial court opined that Hurtt had not testified as to any statements made by Hall for the truth of the matter asserted, but conceded that the portion of Hurtt's testimony that the shoe belonged to Petitioner "gets very close to being a statement in the sense that it being offered to prove the truth of the matter being asserted."  (Tr IV, 140-41.)

The Michigan Court of Appeals found that Hurtt's testimony was properly admitted for the non-hearsay purpose of explaining why the officers went to particular locations to look for evidence:

> We reject defendant's further suggestion that a police officer provided inadmissible hearsay testimony when he testified that he "had been told" where some evidence could be located.  No statement was received into evidence and the information referenced by the officer was not admitted for the truth of the matter asserted, but rather to explain why the officer went to a particular location. MRE 801(a), (c). Accordingly, we find meritless defendant's related, *unpreserved* contention that the

- 35 -

officer's testimony violated the rule in *Bruton v United States*, 391 US 123; 88 S Ct 1620; 20 L Ed 2d 476 (1968), regarding statements by a nontestifying codefendant.

(MCOA Op., 2) (emphasis added.)[3]

In *Bruton*, the Supreme Court held that a co-defendant's confession, which also implicated the defendant, could not be admitted in the joint trial of the two conspirators without violating the non-declarant defendant's rights under the Confrontation Clause unless the co-defendant was available and subject to cross examination. 391 U.S. at 126. Petitioner's case is distinguishable from *Bruton*, however, not only because Petitioner and Hall were not tried jointly, but because the testimony in Petitioner's case was admitted for the non-hearsay purpose of explaining why the officers went to particular locations to look for evidence. *See Tennessee v. Street*, 471 U.S. 409, 413-16 (1985) (noting that unlike *Bruton*, in which the co-defendant's confession was introduced to prove the truth of its assertions, the accomplice's confession in *Street* was introduced, not to prove the truth of its content, but for the non-hearsay purpose of rebutting the defendant's claim of coercion). Accordingly, the decision of the Michigan Court of Appeals was not an unreasonable application of *Bruton*.

Even if the admission of this testimony violated Petitioner's constitutional rights, a constitutional error that implicates trial procedures must be considered harmless unless it had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637. In light of the fact that Hall's statement was not itself admitted into evidence and considering the substantial amount of additional evidence of Petitioner's guilt introduced at trial, I cannot say that this brief reference to statements made by his co-defendant had a substantial or injurious effect

---

[3]Like Ground V above, the Michigan Court of Appeals did not clearly and expressly state that its judgment rested on state procedural bar. Therefore, I conclude that Petitioner is not procedurally barred from pursuing this claim. *See Harris*, 489 U.S. at 263; *Patterson*, 316 F.3d at 604-605.

or influence in determining the jury's verdict.  Any error in admitting this portion of Detective Hurtt's testimony was harmless.  Because any error in the admission of the evidence was harmless, Petitioner cannot establish a due process violation resulting from the admission of Hurtt's testimony.

VII.

Next, Petitioner claims that his due process rights were violated when the trial court permitted the prosecutor to present evidence of flight.  Detective Adams testified that Petitioner was arrested in Nashville, Tennessee, on April 7, 1999.  (Tr V, 30.)  In his closing argument, the prosecutor told the jury, "And you heard he was arrested outside the state.  Court will tell you that is something you can consider to indicate consciousness of guilt." (Tr V, 140.)  The trial court gave the following instruction on flight:

> There has been some evidence that the Defendant ran away after the crime.  This evidence does not prove guilt.  A person may run or hide for innocent reasons such as panic, mistake, or fear.  However, a person may also run or hide because of a consciousness of guilt.  You must consider whether the evidence is true and if true, whether it shows Defendant had a guilty state of mind.

(Tr V, 183.)  Petitioner acknowledges that evidence of flight is sometimes admissible, but claims that it should have been excluded in this case because the probative value of the evidence was outweighed by the danger of unfair prejudice.  He further claims that the trial court's instruction was not sufficient to cure the error.

In addressing Petitioner's claim on appeal, the Michigan Court of Appeals stated:

> Defendant argues that reversal is required because the trial court improperly admitted evidence of his flight. Because defendant did not object at trial to the evidence of flight, we review this issue for plain error affecting his substantial rights. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). We conclude that no plain error occurred, however, because evidence of flight is admissible as substantive evidence of a defendant's guilt. *People v Cutchall*, 200 Mich App 396, 398-399; 504 NW2d 666 (1993), overruled in part on other grounds, *People v Edgett*, 220 Mich App 686,

691-694; 560 NW2d 360 (1996); *People v Casper*, 25 Mich App 1, 7; 180 NW2d 906 (1970).

(MCOA Op. at 2-3.) In this instance, the Michigan Court of Appeals expressly relied on Michigan's contemporaneous objection rule in denying Petitioner's claim. It is clear that the contemporaneous objection rule was well-established at the time of Petitioner's trial. *See, e.g.*, *People v. Kelly*, 423 Mich. 261, 271; 378 N.W.2d 365 (1985). A rule designed to arm trial judges with the information needed to rule reliably "serves a governmental interest of undoubted legitimacy." *Lee*, 534 U.S. at 385. Petitioner's failure to comply with the state's independent and adequate state procedural rule, *i.e.*, making a contemporaneous objection, caused him to default his claims in state court. *See Wainwright v. Sykes*, 433 U.S. 72, 87-88 (1976); *Lancaster*, 324 F.3d at 437; *West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996). Further, even though the court of appeals applied a limited review of the claimed error to determine whether it affected the outcome, Petitioner's failure to object is still considered a procedural default. *See Baze v. Parker*, 371 F.3d 310, 320 (6th Cir. 2004), *cert. denied*, 125 S. Ct. 1670 (2005); *Clifford v. Chandler*, 333 F.3d 724, 728-29 (6th Cir. 2003), *overruled in part on other grounds by Wiggins v. Smith*, 539 U.S. 510 (2003); *Paprocki v. Foltz*, 869 F.2d 281, 284-85 (6th Cir. 1989).

As a result of his default, this Court is barred from reviewing Petitioner's claim unless he demonstrates either: (1) cause for his failure to comply with the state procedural rule and actual prejudice flowing from the violation of federal law alleged in his claim, or (2) that a lack of federal habeas review of the claim "will result in a fundamental miscarriage of justice." *Hicks*, 377 F.3d at 551-52; *see Murray v. Carrier*, 477 U.S. 478, 495 (1986)) (specifying that a 'fundamental miscarriage of justice' will result "where a constitutional violation has probably resulted in the conviction of one who was actually innocent."). Petitioner has not attempted to explain his failure

- 38 -

to object to the evidence at trial.  Where a petitioner fails to show cause, the court need not consider whether he has established prejudice.  *See Engle*, 456 U.S. at 134 n.43; *Leroy v. Marshall*, 757 F.2d 94, 100 (6th Cir. 1985).  Nevertheless, Petitioner cannot show prejudice in light of the overwhelming evidence of his guilt.  Nor has Petitioner shown that the violation claimed resulted in a conviction when Petitioner was actually innocent.  Accordingly, Petitioner's claim is barred from federal habeas corpus review.

## VIII.

In his eighth ground for relief, Petitioner contends that his due process rights were violated when the trial court failed to instruct the jury that their verdict must be unanimous with regard to each offense.  The trial court instructed the jury as to twelve separate counts against Petitioner.  (Tr V, 189-205.)  With regard to unanimity, the trial court charged, "A verdict in a criminal case must be unanimous.  That means in order to return a verdict it is necessary that each of you agrees on that verdict."  (Tr V, 201.)  The jury ultimately found Petitioner guilty of four counts of assault with intent to do great bodily harm less than murder, four counts of assault with intent to rob while armed and one count of conspiracy to commit armed robbery.  The Michigan Court of Appeals rejected Petitioner's claim on appeal, stating:

> Defendant lastly raises the *unpreserved* claim that instructional error occurred because the court did not specifically instruct the jury that its verdict must be unanimous with regard to each separate charged offense.  In light of the facts that the trial court gave a general unanimity instruction and that defendant never requested that the jurors be polled regarding the verdict, we find no *plain error* that affected defendant's substantial rights. *People v Pollick*, 448 Mich 376, 386; 531 NW2d 159 (1995); *People v Burden*, 395 Mich 462, 468-469 (opinion by T. G. Kavanagh, C.J.), 470 (opinion by Williams, J.); 236 NW2d 505 (1975).

(MCOA Op., 3) (emphasis added).

In resolving this claim, the Michigan Court of Appeals stated that the claim was "unpreserved" and applied a "plain error" standard. Because the court of appeals reviewed the claim only for plain error, it appears that the court was relying on a default. Petitioner, therefore, must show cause and prejudice. *See Hicks*, 377 F.3d at 551-52; *Murray*, 477 U.S. at 495. Petitioner has not attempted to explain his failure to object to the court's instruction. Even if Petitioner could show cause for his default, he could not establish prejudice or actual innocence in light of the strong evidence of his guilt as to each of the offenses for which he was found guilty.

## Recommended Disposition

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied.

Dated:  May 31, 2006                     /s/ Hugh W. Brenneman, Jr.
                                         Hugh W. Brenneman, Jr.
                                         United States Magistrate Judge

## NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within ten days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).